[Cite as *State v. Hartsfield*, 2026-Ohio-2355.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2025-10-122 |
| vs. | : | <u>OPINION AND</u><br><u>JUDGMENT ENTRY</u><br>6/22/2026 |
| PHILIP FLOYD HARTSFIELD, | : | |
| Appellant. | : | |
| | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2025-05-0620

Michael T. Gmoser, Butler County Prosecuting Attorney, and Stephen M. Wagner, Assistant Prosecuting Attorney, for appellee,

Law Office of John H. Forg, and John H. Forg III, for appellant.

## O P I N I O N

**HENDRICKSON, J.**

{¶ 1} Appellant, Philip Floyd Hartsfield, appeals from his convictions in the Butler County Court of Common Pleas for rape, kidnapping, and robbery. For the reasons set

forth below, we affirm his convictions.

{¶ 2} On June 3, 2025, appellant was indicted on one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree (count one); one count of sexual battery in violation of R.C. 2907.03(A)(1), a felony of the third degree (count two); one count of kidnapping in violation of R.C. 2905.01(A)(4), a felony of the first degree (count three); one count of kidnapping in violation of R.C. 2905.01(A)(3), a felony of the first degree (count four); and one count of robbery in violation of R.C. 2911.02(A)(2), a felony of the second degree (count five). The charges arose out of allegations that on May 8, 2025 in Butler County, Ohio, appellant kidnapped, raped, and robbed H.L. by forcing her to perform fellatio on him and stealing her jewelry. Appellant used threats and terrorized H.L. in committing the offenses.

{¶ 3} Appellant pled not guilty to the charges and a three-day jury trial was held in August 2025. At trial, H.L. testified that on May 7, 2025, she made the acquaintance of Jeff Thurman, who was driving a rented U-Haul truck. H.L. borrowed the U-Haul truck that evening so that she and her then-boyfriend, Ian, could move some items. When she and Ian were finished using the U-Haul truck, they parked the vehicle in the parking lot of the Fairfield North Elementary School, which was located across the street from Ian's residence in Fairfield Township, Butler County, Ohio.

{¶ 4} The following day, May 8, 2025, Thurman and appellant came to pick up the U-Haul truck. Appellant drove Thurman's mother's SUV, a Chevrolet Equinox. H.L. met Thurman where the truck was parked to make sure he found the keys she had left behind. At this time, appellant introduced himself to H.L. as "S.K.," a name that matched the initials appellant had tattooed on his face. According to H.L., appellant began telling her that "[h]e had killed eight people prior, that – something about burning 4,000 degrees for a body." H.L. testified that, "I realized that the look on [appellant's] face let me know that

- 2 -

I probably was going to be in danger if I would have been combative at all." H.L. indicated she was told by appellant and Thurman that she needed to leave Ian's house, get her dog and go to her own home. Appellant also told her that "if [she] was smart, [she] would get [her] dog and get out because he would be back in a couple hours and that he didn't care if [she] was in it or not, he was going to burn [Ian's] damn house down."

{¶ 5} H.L. indicated that Thurman drove off in the U-Haul and appellant left in the SUV. She returned to Ian's house. A short while later, she took her dog outside for a walk. As she was walking the dog, appellant drove up in the SUV with Thurman in the vehicle. According to H.L., the men threatened to kill her dog and Ian if she did not get into the vehicle. H.L. testified she went into "panic mode" but got in the front passenger seat, with Thurman sitting in the backseat. Appellant drove the SUV to where the men had parked the U-Haul. Thurman got out of the SUV and into the U-Haul. Thurman drove the U-Haul to a nearby Speedway, with appellant following in the SUV.

{¶ 6} H.L. testified that when the SUV was stopped at Speedway, she tried to get out of the vehicle, but the door was locked and would not open. She was also unable to roll down the passenger-door window. Only appellant could control the window. When Thurman drove off in the U-Haul again, appellant followed behind in the SUV for a short period of time before going in a different direction.

{¶ 7} Appellant proceeded to drive around Hamilton, Butler County, Ohio for approximately three hours. During this time, H.L. made repeated pleas to be let out of the vehicle. Appellant continued to make statements about killing eight people, mentioning that two of them had been women. He indicated he had "strangl[ed] the life out of one of the girls." At some point, appellant told H.L. to turn off her phone. He then told H.L., "that ass, gas, or cash, [she] was going to pay." H.L. handed over various rings and a necklace she had been wearing.

{¶ 8} At some point, appellant drove into a parking garage in Hamilton, where he used a keycard to gain access. Appellant told H.L. that she was going to pay either by taking her pants off or "suck[ing] his dick." H.L. started crying and believed that if she did not comply, appellant would harm her. Appellant pulled down his pants and underwear. He grabbed H.L.'s neck and pulled her head down towards his lap. H.L. said "no." Appellant ended up driving out of the garage, with his pants and underwear pulled down. As he drove around, appellant continued to pressure H.L. to perform oral sex. H.L. testified that though she did not want to, she eventually "gave him head" by putting his penis in her mouth. While she was performing oral sex, appellant pushed her head down, causing her to gag. Appellant's arm was on the back of her head, forcing her head down. When appellant finished by ejaculating in H.L.'s mouth, H.L. used napkins to wipe his semen from her face and mouth. Though appellant cracked the passenger side window and told H.L. to toss out the napkins, H.L. did not toss out all the napkins she used to clean up appellant's ejaculate. She tucked one of the napkins in the pocket of the passenger door.

{¶ 9} H.L. testified that as appellant drove around Hamilton, she tried multiple times to open the windows and doors of the SUV so that she could escape. It was not until after appellant received oral sex that he drove to a Hamilton neighborhood a few blocks away from H.L.'s home and allowed her to exit the vehicle. However, he sped off without allowing her to retrieve her cellphone, jewelry, or dog from the vehicle.

{¶ 10} H.L. walked home and called 9-1-1 to report the incident before going to a local hospital to be examined. A forensic nurse conducted a sexual assault exam. The forensic nurse noted that H.L. had reported tenderness to the back of her head, though there were no visible injuries. The nurse used swabs to take samples from H.L.'s mouth.

{¶ 11} Officers from the Fairfield Township Police Department responded to the hospital to obtain a statement from H.L. and to collect evidence. H.L. provided the officers with a description of appellant and the vehicle he was driving. The officers were able to track down the SUV and obtain a warrant for appellant's arrest and a warrant to search the SUV. Appellant consented to providing a DNA sample. Inside the SUV officers discovered a napkin, which was collected into evidence. Subsequent testing of the napkin by a forensic scientist with the Ohio Bureau of Criminal Investigation revealed the presence of semen. DNA testing of the semen sample indicated a mixture of DNA from two contributors: H.L. and appellant.

{¶ 12} Thurman testified that it was his mother's SUV that appellant was driving on May 8, 2025. As such, Thurman was familiar with the vehicle and knew that the SUV's windows, including the front passenger window, could be locked from a panel on the driver's side door. Thurman also testified that the SUV was equipped with child-locks.

{¶ 13} Appellant took the stand in his own defense and testified that his sexual encounter with H.L. was consensual. Appellant admitted to driving H.L. around Hamilton for multiple hours on May 8, 2025. He claimed that H.L. willingly gave him a necklace that she was wearing and that she was a "willing participant" when she gave him oral sex. He denied that he forced H.L.'s head down as she was performing the act of fellatio. He further denied that the doors or windows in the SUV were locked, that H.L. had been prevented from exiting the vehicle, or that he had talked about killing people in the past and the temperature it takes to burn bodies. He claimed that after their sexual encounter, he drove close to H.L.'s neighborhood so that she could walk the rest of the way home. On cross-examination, he admitted to speeding off with H.L.'s dog still in the vehicle and further admitted that he gave the dog to another woman.

{¶ 14} After considering the foregoing testimony, the jury found appellant guilty of all offenses. At sentencing, the court merged the sexual battery offense and the kidnapping offense in count three with the rape offense. Appellant was sentenced to an indefinite mandatory prison sentence of a minimum of 10 years to a maximum 15 years on the rape offense. The court imposed a ten-year prison sentence on the kidnapping offense in count four and a six-year prison sentence on the robbery offense, both of which were run concurrently to the sentence imposed on the rape offense. Appellant was designated a Tier III sex offender.

{¶ 15} Appellant appealed his conviction, raising the following as his sole assignment of error:

{¶ 16} THE TRIAL COURT ERRED IN CONVICTING [APPELLANT] OF RAPE, KIDNAPPING, AND ROBBERY WHEN THE MANIFEST WEIGHT OF THE EVIDENCE ESTABLISHES THAT THE SEXUAL CONDUCT AT ISSUE WAS CONSENSUAL.

{¶ 17} Although the caption of appellant's assignment of error indicates he is challenging whether the manifest weight of the evidence supports his convictions for rape, kidnapping, *and robbery*, the body of his assignment of error focuses only on his rape and kidnapping convictions. As appellant's brief does not set forth an argument relating to the robbery offense with citations to the authorities, statutes, and parts of the record on which he relies, as required by App.R. 16(A)(7), we will not review appellant's robbery conviction. *See* App.R 12(A)(2). Rather, our review is limited to whether the rape and kidnapping offenses were supported by the manifest weight of the evidence.

{¶ 18} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). To determine whether a conviction is against the manifest weight of the evidence, the reviewing court

- 6 -

must look at the entire trial record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.). "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, 'these issues are primarily matters for the trier of fact to decide.'" *State v. Barnes*, 2011-Ohio-5226, ¶ 81 (12th Dist.), quoting *State v. Walker*, 2007-Ohio-911, ¶ 26 (12th Dist.). An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id*., citing *Thompkins*, 78 Ohio St.3d at 387.

{¶ 19} Appellant was convicted of rape in violation of R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." A person acts purposely "when it is the person's specific intention to cause a certain result." R.C. 2901.22(A). "Force" is defined by the Revised Code as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Sexual conduct includes the act of fellatio. R.C. 2907.01(A).

{¶ 20} Appellant was also convicted of two counts of kidnapping. The first, kidnapping in violation of R.C. 2905.01(A)(4), provides that "[n]o person, by force, threat, or deception . . . shall remove another from the place where the other person is found or restrain the liberty of the other person, . . . [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will." Sexual activity means "sexual conduct or sexual contact, or both." R.C. 2907.01(C). It therefore encompasses the act of fellatio. R.C. 2907.01(A). The other count of kidnapping,

kidnapping in violation of R.C. 2905.01(A)(3), provides that "[n]o person, by force, threat, or deception . . . shall remove another from the place where the other person is found or restrain the liberty of the other person, . . . [t]o terrorize, or to inflict serious physical harm on the victim or another." The term "terrorize" is not defined by the Ohio Revised Code. The term has instead been defined "according to its common usage, i.e., 'to fill with terror or anxiety.'" *State v. Chasteen*, 2009-Ohio-1163, ¶ 21 (12th Dist.), quoting *State v. Eggleston*, 2008-Ohio-6880, ¶ 30, fn. 1 (11th Dist.). *See also State v. Bryant*, 2012-Ohio-678, ¶ 15 (12th Dist.); *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/terrorize (accessed June 18, 2026).

{¶ 21} Appellant contends the jury lost its way in convicting him of the rape and kidnapping offenses as the "sexual encounter . . . was not forceful, but voluntary [and H.L.] likely engaged in sexual activity in order to gain additional drugs." Appellant maintains that the weight of the evidence shows that H.L. voluntarily climbed into the SUV, voluntarily rode around the city of Hamilton with him for hours, and voluntarily performed oral sex on him. He contends H.L.'s trial testimony and version of events was not credible.

{¶ 22} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the original trier of fact. *State v. Hollon*, 2025-Ohio-2725, ¶ 20 (12th Dist.); *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). "'The jury is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of proffered testimony.'" *State v. Watson*, 2025-Ohio-883, ¶ 13 (12th Dist.), quoting *State v. Fox*, 2009-Ohio-556, ¶ 18 (12th Dist.). "[I]t [is] within the province of the jury, as the trier of fact, to take note of any inconsistencies in the testimony and resolve them accordingly, believing all, part, or none of each witness's testimony." *State v. Lark*, 2018-Ohio-4940, ¶ 29 (12th Dist.), citing

*State v. Woodard*, 2017-Ohio-6941, ¶ 24 (12th Dist.). "A conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony offered by the prosecution." *State v. Baker*, 2020-Ohio-2882, ¶ 31 (12th Dist.).

{¶ 23} In the present case, the jury was presented with two different versions of events. The State, through H.L.'s testimony, presented evidence that upon meeting H.L., appellant immediately began to describe killing eight people and discussed the temperature at which bodies burn. He instructed H.L. to leave Ian's home and indicated he was going to burn down Ian's home, regardless of whether she and her dog were inside it. He used threats to get her into the SUV, indicating that he would kill her boyfriend and dog if she did not get in the vehicle. H.L. testified about the terror and anxiety appellant's statements caused her, noting that she went into "panic mode" and "realized [from] the look on [appellant's] face" that she would be in danger if she was at all combative with him.

{¶ 24} H.L. testified that she tried a number of times to exit the SUV and get away from appellant, but she was unable to open the SUV's passenger door or window. Appellant forced her into performing oral sex, telling her, "ass, gas, or cash, [she] was going to pay." H.L. tried to appease appellant by giving him her jewelry. That did not satisfy appellant and he demanded she either take her pants off or "suck his dick." Though H.L. told appellant "no" and that she did not want to give him oral sex, she relented after being forced to travel in the car with him for multiple hours and being told about how he had previously strangled a woman. When H.L. put her mouth on appellant's penis, he used his arm to force her head down, causing her to gag. Appellant ejaculated in her mouth, leaving H.L. to use napkins to clean her face and mouth. Subsequent testing of a napkin found in the SUV tested positive for semen and contained a mixture of appellant's and H.L.'s DNA.

{¶ 25} Appellant's version of events largely mirrored H.L.'s testimony. He indicated he drove H.L. around Hamilton for hours and that H.L. performed oral sex on him in the SUV. However, in appellant's version of events, the sexual act and H.L.'s presence in the vehicle were voluntary. He denied forcing H.L. to perform fellatio, denied making threats to harm her, her boyfriend, or dog, denied keeping her locked into the vehicle, and denied forcing her head down when she was performing oral sex. The jury heard appellant's version of events and did not find it credible. Rather, the jury found H.L.'s testimony credible. It did so despite defense counsel's efforts to challenge H.L.'s credibility and the veracity of her statements on cross-examination. As previously stated, "[a] conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony offered by the prosecution." *Baker*, 2020-Ohio-2882, at ¶ 31 (12th Dist.). Furthermore, "'the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Cook*, 2023-Ohio-256, ¶ 31 (12th Dist.), quoting *State v. Poindexter*, 2021-Ohio-1499, ¶ 22 (10th Dist.).

{¶ 26} Based on the evidence in the record, we find that the jury did not lose its way in finding appellant guilty of rape and the two counts of kidnapping. The manifest weight of the evidence supported appellant's convictions. Accordingly, appellant's sole assignment of error is overruled.

{¶ 27} Judgment affirmed.

BYRNE, P.J., and M. POWELL, J., concur.

- 10 -

# J U D G M E N T   E N T R Y

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

*/s/ Matthew R. Byrne, Presiding Judge*

*/s/ Robert A. Hendrickson, Judge*

*/s/ Mike Powell, Judge*